EDMOND DOUGHERTY, APPELLEE, v. OMAHA & COUNCIL BLUFFS STREET RAILWAY COMPANY, APPELLANT.

FILED APRIL 16, 1925. No. 23109.

1. **Street Railways:** LIABILITY. Where an electrically propelled street car runs against a person to his injury, liability arises when the peril is discovered by the motorman or, by the exercise of ordinary care, should have been discovered by him in time to have avoided the injury.

2. **Appeal:** REVIEW. Where questions of fact have been properly submitted, and have been determined by the jury, which has seen and heard and observed the demeanor of the witnesses, we will not, ordinarily, disturb the verdict.

3. **Negligence:** QUESTION FOR JURY. It is elementary that, in a jury trial, when different minds may reasonably reach different conclusions from a given state of facts as to whether negligence has been established, the question of negligence is for the jury.

APPEAL from the district court for Douglas county: L. B. DAY, JUDGE. *Affirmed.*

*John L. Webster* and *R. B. Hasselquist,* for appellant.

*Herman Aye* and *L. J. TePoel, contra.*

Heard before MORRISSEY, C. J., DEAN, DAY and THOMPSON, JJ., REDICK and SHEPHERD, District Judges.

DEAN, J.

Plaintiff recovered a verdict for $6,000, and judgment thereon, for personal injuries sustained from coming in collision with one of defendant's street cars in Omaha, while he was afoot and crossing Tenth street, between the block bounded by Harney street on the north and Howard street on the south. Defendant, alleging prejudicial error, has brought the record here to have it reviewed.

Defendant's south-bound Tenth street cars run on the west-side tracks and its north-bound cars on the east-side

tracks. Plaintiff testified in substance that, on May 17, soon after 7 o'clock in the forenoon, he drove from his home, and, after parking his car on the east side of Tenth street, about 25 feet north of Howard street, he walked west across the street, and that, very shortly thereafter, when he was in the street on his return to his car, he saw a south-bound street car rapidly approaching; that, when this car passed, he looked to the north and saw an automobile on the west side of Tenth street approaching him from that direction; that he walked toward the east track at a gait of about 3 miles an hour; that the south-bound car ran at the rate of 15 to 18 miles an hour, and had gone at least 10 or 12 feet before he stepped on the east track, and the north-bound car was not then in sight; that it came on, without a warning sound of any sort, and so close to him that he could not get off the track, and could do nothing except put his hands against the front end of the oncoming car, and in this manner he was pushed and slid along the street for some distance, until he fell beneath the car. He further testified that, when he was taken out from the front car fender, he was removed to and remained at St. Joseph's Hospital about six weeks; that a hip was fractured and lungs injured and his head and face cut, and "pneumonia set in after the fourth day." This statement was substantially corroborated by an attending physician. On cross-examination defendant testified that he did not look for the approach of the north-bound car before he stepped on the east track.

Plaintiff was 50 when the accident occurred, and he was then employed as a stationary fireman by the M. E. Smith Company, and his earnings at the company's plant, together with his earnings from some other outside employment, such as unloading coal after 4 o'clock in the afternoon, gave him an income, before the injury, of about $206 a month.

A witness called by plaintiff, who was a passenger on the north-bound car, testified that it stopped at the south side of Howard street, and when it reached the north side

of the street it was going between a "15 and 20 mile gait," and after the accident it stopped with "a sudden jerk" about 15 feet south of the alley which is midway between Howard and Harney streets, and that the car ran probably 8 or 10 feet after the air lever was applied; that he did not hear the gong sounded nor any signal given by the motorman before the impact; that when the car stopped, Jansen, the motorman, "got down and looked under," and said: "My, God! there is a man under the car." Another passenger testified, on the part of plaintiff, that the gong was not sounded nor was a signal given to warn pedestrians of the car's approach to the point of impact, and that it then "was going about 15 miles an hour," and when the air was applied it ran about 8 or 10 feet.

In respect of the operation of the car fender, in case of accident, a former motorman testified in substance, on the part of plaintiff, that, when an object the size of a man's body is lying between the rails, it comes in contact with a bar which causes the fender to drop and the motorman is thereby advised of the obstruction by the sound of the drop and also by the rattling of the released fender as the car proceeds. He further testified that, when the fender drops, a pin protrudes through the floor from below, and this also advises the motorman that the fender is down, and it is then his duty to replace it by pressing down on the pin with his foot, and this can readily be done unless it is weighted down by a heavy object.

Among others, defendant called the following witnesses: James Jansen, motorman, in charge of the car which inflicted the injury, testified that he first saw plaintiff when he stepped over the rail of the west track from behind a car going south, when the front end of his car was about even with the rear end of the passing car, which was moving at the rate of about 5 or 6 miles an hour, and that his car was running north at the rate of 8 or 10 miles an hour; that plaintiff took two steps after the witness saw him and ran into the front left-hand corner of his car and fell down right over the track; that he promptly ap-

Dougherty v. Omaha & C. B. Street R. Co.

plied the emergency brake and the air brake, and that his car ran between 12 or 15 feet before it stopped about 8 feet south of the alley; that, as he approached the place where plaintiff was struck, he continuously sounded his gong; that he did not see plaintiff's approach because he was behind the south-bound car, which obstructed his vision. The motorman also testified that plaintiff told him, before the ambulance took him away, that he did not see the approach of the north-bound car.

The motorman of the south-bound car testified that plaintiff crossed Tenth street from the west on a run, and within 5 or 6 feet of the rear end of a south-bound car which was ahead of his car; that plaintiff was looking east when the car struck him and it "knocked him ahead perhaps several feet, * * * knocked him flat," the north-bound car then running at the rate of 3 to 5 miles an hour. He further testified that the street cars at that time of day passed the place where the accident occurred about every minute. F. J. McEvoy, a passenger on the north-bound car, testified that he saw plaintiff's approach to the car, but whether he was walking or running he did not know; that the car that struck plaintiff was going at the rate of 10 or 15 miles an hour, and that it ran 15 or 20 feet before it stopped. Another passenger on the south-bound car testified that he heard no gong sounded or other signal; that he first saw plaintiff when the car turned into Tenth street, but did not know whether plaintiff was running toward the car, but that he saw him fall. Another witness was on the north-bound car, and in his opinion it ran at the rate of 8 miles an hour, and that plaintiff was "trotting" east from behind the car going south. In his opinion the north-bound car stopped about 8 feet after plaintiff went down. Another passenger testified that the car came to a sudden stop, and that after plaintiff was taken out from under the car he "understood him to say" that he "was going around behind another car, and he stepped in front of this one." The conductor of the north-bound car testified that his attention was first called to the accident when the car

"came to a sudden jerk," and that at the time the car was going 6 or 8 miles an hour. No inquiry was made, however, of at least three of defendant's witnesses as to whether the gong was sounded or any other signal of the car's approach was given by the motorman.

Much evidence was introduced by the parties as to whether the accident happened at or close to the intersection of Howard and Tenth streets or close to the alley which is midway between Howard and Harney streets, and in respect of the speed of the street car, and as to whether plaintiff ran or walked upon the track just before the impact, and as to whether the gong was sounded by the motorman. The evidence conflicts in respect of all the material facts. But questions of fact are for the jury, as has often been said. One of the most vital points in the case is whether motorman Jansen saw or, by the exercise of ordinary care, should have seen plaintiff on the track, and in a place of peril, in time to have stopped the car before he was struck, even though plaintiff was oblivious of danger.

Defendant's counsel argue: "Under any reasonable view of the facts in this case, plaintiff's own negligence continued up to and was the proximate cause of his injury. The facts in the case furnish no room for the 'last clear chance' doctrine. * * * The court should have sustained defendant's motion for directed verdict."

We do not agree with counsel. In this jurisdiction the rule is well settled that, where an electrically propelled street car runs against a person, to his injury, liability arises when the peril is discovered by the motorman or, by the exercise of ordinary care, should have been discovered by him in time to have avoided the injury. *Omaha Street R. Co. v. Duvall*, 40 Neb. 29; *Lucas v. Omaha & C. B. Street R. Co.*, 104 Neb. 432. See, also, *Wilson v. Union P. R. Co.*, 107 Neb. 111, where the same principle is involved.

Did the motorman exercise ordinary care? Was it the dropping of the fender alone that apprised him that something was wrong, and was it this which caused him to

stop his car with a sudden jerk? And was the motorman surprised when, as one witness testified, he "got down and looked under," and exclaimed, "My, God! there is a man under the car?" Did his exclamation cause the jury to believe that, when he "got down and looked under," he saw plaintiff for the first time? It may be. Anyhow, this evidence, together with all the evidence in the case, was for the jury. In such case, where questions of fact have been properly submitted, and have been determined by the jury, which has seen and heard and observed the demeanor of the witnesses, we will not, ordinarily, disturb the verdict. We think the record discloses sufficient competent evidence to support the verdict. It is elementary that, in a jury trial, when different minds may reasonably reach different conclusions from a given state of facts as to whether negligence has been established, the question of negligence is for the jury. *Oakes v. Omaha & C. B. Street R. Co.*, 104 Neb. 788.

In addition to the foregoing assignments of alleged error, we have examined the instructions given by the court, over defendant's objections, and those requested by defendant, and refused, and, in view of the record before us, we conclude that reversible error cannot be predicated thereon.

The judgment is

AFFIRMED.